UNITED STATES, Appellee

v

JOHN D. HAMILTON, Airman Third Class,
U. S. Air Force, Appellant

10 USCMA 130, 27 CMR 204

No. 12,002

Decided January 9, 1959

*Captain Norman J. Nelson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Sam F. Carter*.

*Lieutenant Colonel James R. Thorn* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Robert W. Michels*.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was convicted by special court-martial of assault with a dangerous weapon, to wit: a switch blade knife, in violation of Article 128 of the Uniform Code of Military Justice, 10 USC § 928.

This Court granted review of the following two issues:

"1. Whether the court-martial should have been instructed on assault and battery as a possible lesser included offense.

"2. Whether the court-martial should have been instructed on the right to use reasonable force to prevent or terminate crime."

The first issue.

Preliminarily, it is noted that no request was made at trial that the president instruct on assault and battery as a lesser included offense to the offense charged. Appellate defense counsel contend, however, the president should have instructed *sua sponte* on assault and battery relying upon United States v Clay, 9 USCMA 582, 26 CMR

362. The Government argues that the *Clay* case is distinguishable. We agree with the Government.

That instructions are required on the elements of lesser included offenses raised by the evidence as alternatives to the offense charged is clear. United States v Clay, supra, and cases cited. A determination of whether assault and battery was raised as an alternative in the instant case necessitates a rather detailed recitation of the facts.

On the morning of March 5, 1958, Airman Second Class McKissack, Airman Second Class Jackson (the victim), and the accused, Airman Third Class Hamilton, returned to their barracks after being on duty as air policemen. Airmen McKissack and Hamilton left the barracks to go to a trailer court to meet a girl named Mary. Prior to their departure, Airman Hamilton placed a 10½ inch switch blade knife in his pocket. Airman Jackson apparently went to bed. In the trailer McKissack, Hamilton, and Mary listened to some records and had a few drinks. Hamilton left the trailer in order to see his

**131**

first sergeant. After his return, Airman Jackson joined the party at the trailer around 11:00 a.m. According to Jackson, he had been invited to the party by the accused, Hamilton. Shortly after the noon hour McKissack and Hamilton left to obtain a taxi, leaving Jackson and Mary in the trailer. On their return Jackson was somewhat inebriated, and the girl Mary was crying.

The four of them then entered an English taxicab, although McKissack objected to Jackson's entering the cab. Jackson stated he had been invited to enter the cab by both McKissack and Hamilton.

In the cab Jackson sat beside the driver to the left. The taxi was a right-hand drive type. Mary sat in back between the accused and McKissack. Thus, McKissack was directly behind the driver, and Hamilton was seated directly behind Jackson. During the trip, Jackson used abusive language toward Mary and the accused. He persisted in this conduct despite several requests on the part of McKissack to desist. Periodically, Jackson spat or drooled saliva onto Hamilton, and, according to the driver of the cab, he may have swung at Hamilton or the others with his fist. All the passengers in the cab were intoxicated to varying degrees, Jackson apparently being the most inebriated of the four. Jackson continued his misbehavior, and sometime during the altercation the accused grabbed Jackson around the neck with one arm, and with the other pulled out a switch blade knife and placed the blade of the knife against the left side of Jackson's neck. There is conflicting testimony as to whether the girl, Mary, was still in the cab at this time. The accused said, "Will you turn around in the front and be quiet? I don't want to hurt you." Jackson turned around in his seat and obeyed the order of the accused. Jackson received a minor two to three-inch cut at the place where the accused had placed his knife. Upon putting his hand to his neck, he noticed he was bleeding. The accused admitted he "tried to frighten him with a knife." The knife in question was recovered from the accused's person when he was

132

apprehended, and the knife when extended measured approximately 10½ inches, the blade of which was five inches long. Following the incident, McKissack and Hamilton alighted from the cab, and Jackson was sent back to the Air Base in the same taxi.

We have here, therefore, an admission by the accused that he intended to frighten the victim with █ the knife. Both the victim and Airman McKissack testified to the accused's use of the knife. That the knife belonged to the accused was undisputed, and it was found on his person when he was searched by the air policeman. The taxi driver alone testified he did not see the knife—a fact of no great import because he was busily engaged in driving the vehicle in traffic. This, of course, is far different from a statement that the accused did not use a knife. Thus, the evidence of the use of the knife by the accused was undisputed.

The instant case differs considerably from the *Clay* case, supra, where the knife was found in possession of the victim who gave it to the authorities just before they searched him and where the whole issue in the case turned on whether or not the accused had possessed and used a knife in the affray. The accused's defense there was that, admitting he had been in a fist fight, he had not used a knife. The use of the knife, therefore, became an important question of fact for the triers of fact and under the circumstances of that case meant the difference between assault with a dangerous weapon and assault and battery.

In the instant case, as noted, that issue is not presented. The circumstances herein do not reasonably raise assault and battery as an alternative and no instruction thereon was required.

### The second issue.

The accused, although an off-duty air policeman, as was the victim, makes no claim to acting in any █ official capacity. His actions, therefore, are governed by the rules of law applicable

to private individuals. Questions of the right of private individuals to use reasonable force to prevent or terminate crime arise infrequently and the right is generally held to extend only to the use of reasonable force to prevent commission of a felony in one's presence.

Corpus Juris Secundum phrases it thus:

**"A private person may use force essential to prevent commission of a felony in his presence, although the degree of force employed should not exceed that demanded by the circumstances.**

"A private individual seeing another person actually perpetrating, or about to perpetrate, a felony may interfere, employing such force as is necessary to prevent the commission of the felony, and properly may resist all attempts to inflict bodily injury on himself by a person so engaged. The law will not be astute in searching for such a line of demarcation between the lawful and authorized, and the unauthorized and illegal, acts of individuals in the protection of property, the prevention of crime, and the arrest of offenders as will take an innocent citizen, whose property and person are in danger, from the protection of the law and place his life at the mercy and discretion of an admitted felon. However, one person cannot lawfully use unnecessary or wanton violence or inflict unnecessary or wanton injury on another in attempting to prevent the commission of a felony." [24 CJS, Criminal Law, § 2009; see also "Justification for Injury" by Beale, 41 Harvard Law Review 553, 557.]

Appellate defense counsel suggests that the victim was "embarked on a course of anti-social conduct which could have resulted in his being charged with several offenses." He suggests the following possibilities: drunk and disorderly conduct, using vile and abusive language toward a female, and assault. He then goes on to discuss the right to use force to prevent the commission of felonies.

Nowhere, however, is our attention called to any claim of the existence of such right where a felony is not involved. Appellate defense counsel's brief is silent as to any felonies committed by the victim. The Manual for Courts-Martial. United States, 1951, defines felony in paragraph 213$d$(6) as follows:

". . . Any offense of a civil nature punishable under the authority of the code by death or by confinement for a term exceeding one year is a felony."

Drunk and disorderly offenses are subdivided in the Table of Maximum Punishments, paragraph 127$c$, of the Manual, supra, and are punishable in varying degrees. However, the maximum confinement for any such offense is six months, e.g., for being drunk and disorderly under such circumstances as to bring discredit upon the military service. For a simple assault, the Table provides for a maximum confinement for three months and for simple assault and battery, six months. And even assuming, arguendo, that Mary was present at the time of the assault, a matter which we noted earlier was the subject of conflicting testimony, communicating indecent, insulting or obscene language to a female carries a maximum of one year's confinement, still short of the felony requirement that the confinement exceed one year.

We conclude, therefore, that however obnoxious the victim's conduct may have been, there is nothing in the record to show he committed a felony. There was, therefore, no right of the accused to use reasonable force on the theory of preventing or terminating a felony and no instruction thereon was required. It is noted in passing that from this record it is impossible to tell just what the defense was but neither the evidence nor argument of counsel raises any claim of self-defense. What we have said, therefore, does not relate to any such possible issue.

For the reasons stated, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.